## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA


**BURNELL SHEDRICK**                                                          **CIVIL ACTION**


**VERSUS**                                                                          **No. 11-820**


**MARRIOTT INTERNATIONAL, INC.,**                                  **SECTION "I"**
**ET AL.**



## ORDER AND REASONS

Before the Court are cross-motions[1] for summary judgment filed by plaintiff, Burnell

Shedrick ("Shedrick"), and defendants, Marriott International, Inc. ("Marriott"), Aetna Life

Insurance Company ("Aetna") and Marriott International, Inc., Long-Term Disability Plan (the

"plan")[2] (collectively, "defendants").  For the following reasons, Shedrick's motion is **DENIED**

and defendants' motion is **GRANTED**.

---

[1] R. Doc. Nos. 23 and 24.

    The parties stipulated that the summary plan description (joint exhibit 1), the disability insurance policy (joint exhibit 2), and the entire administrative record (joint exhibit 3) are contained in a manual attachment that was filed with the Court.  R. Doc. Nos. 22 and 30.  Each page of this manual attachment is Bates stamped with a unique number.  The Court refers to any page in this attachment as JE [Bates stamp].  For example, the first page of the manual attachment would be JE 1.

[2] The plan in effect at the time Shedrick filed his claim provided both short-term disability ("STD") and long-term disability ("LTD") benefits to eligible Marriott employees.  To qualify for STD benefits, an employee must have been incapable of performing the "material duties of [his] own occupation."  JE 694.  If an employee satisfied the STD test for disability, he would be entitled to such benefits for twenty-six weeks following an 8-day elimination period.  JE 683.

    To qualify for LTD benefits, an employee had to first satisfy a 182-day elimination period.  JE 66.  If the employee did so, he would receive LTD benefits if he could not perform the "material duties of [his] own occupation" for the first twenty-four months following the onset of his disability.  JE 8.  Following this twenty-four month period, an employee would continue to receive LTD benefits if he was "unable to work at any reasonable occupation" due to his disability.  JE 8.

    Over the course of events at issue in the above-captioned matter, Shedrick pursued both STD and LTD benefits.  Shedrick has named the "Marriott International, Inc., Long-Term Disability Plan" as a defendant.  Nevertheless, the Court has reviewed all terms of both STD and LTD coverage and, for the sake of simplicity, will refer to all disability coverage collectively as "the plan."

### *BACKGROUND*

Shedrick began his employment with Marriott on May 23, 1973.[3]  As a Marriott employee, Shedrick was enrolled in and paid premiums for an ERISA[4] welfare plan providing disability benefits if he met the plan's requirements.[5]  In October 2009, Shedrick was caring for his dying wife at home.  On an unspecified date he tried to lift her and in doing so he injured his back.[6]  As a result of this injury, he filed a claim for STD disability benefits[7] on November 9, 2009, and he ceased his work with Marriott that same day.[8]

Shedrick was employed as Marriott's director of engineering at a hotel in Philadelphia, Pennsylvania, at the time he filed his disability claim.[9]  He then moved to New Orleans, Louisiana.[10]

The plan designated the Marriott corporate benefits department as the plan administrator.[11]  Aetna administered claims incurred under the plan.[12]  The plan also granted Aetna discretionary authority to determine whether and to what extent eligible employees were entitled to benefits and to construe any disputed policy terms.[13]

After Shedrick filed his claim, Aetna instructed him to provide certain medical records via a letter dated November 17, 2009.[14]  Shedrick submitted an attending physician statement

---

[3] JE 74.
[4] Employee Retirement Income Security Act of 1974 ("ERISA," 29 U.S.C. § 1001, *et seq.*).  JE 31.
[5] JE 1 and 75.
[6] JE 80 and 93.
[7] *See* n.2.
[8] JE 73, 75-80, 215-217 and 242.
[9] JE 203.
[10] JE 93.
[11] JE 30.
[12] JE 30.
[13] JE 63.
[14] JE 85.

("APS") completed by Dr. Samuel Vrooman ("Dr. Vrooman") and an MRI report.[15]  The MRI report stated that Shedrick had "shallow central to bilateral disk herniation without central spinal stenoses [sic][,] no foraminal stenoses [sic] [and] no nerve root compression at disks L4-L5."[16] Further, Shedrick had a "central to left sided extruded disk herniation and compression of the traversing left S1 nerve root," but "[n]o central canal stenosis," "[n]o foraminal stenois," and "a mild bilateral facet joint anthropathy" at disks L5-S1.[17]  Shedrick also exhibited "bilateral facet joints arthropathy at L3-L4, [with] right greater than the left facet joint effusion with a facet joint edema on the right."[18]  Dr. Vrooman indicated that Shedrick would be able to return to work on "2/8/09," a date which had passed before he completed the APS form.[19]  The claims adjuster spotted the error and noted that Dr. Vrooman would need to provide clarification regarding Shedrick's anticipated return-to-work date.[20]

Based on Shedrick's self-reported job responsibilities, Aenta classified his job as director of engineering as a "medium" duty occupation.[21]  Aetna approved Shedrick's claim for STD payments through November 30, 2009.[22]  The claims administrator amended his return-to-work date as December 1, 2009, pending receipt of updated medical information from Dr. Vrooman.[23]

Aetna sent Shedrick a letter outlining the steps that he would have to take in order to receive benefits beyond November 30, 2009.[24]  The letter stated that Shedrick was entitled to

---

[15] JE 216-219.
[16] JE 219.
[17] JE 219.
[18] JE 219.
[19] JE 217.
[20] JE 89.
[21] JE 89.
[22] JE 91-92.
[23] JE 91-92.
[24] JE 226.

$1,656.96 in gross benefits per week.[25]  Because Shedrick did not provide supplemental medical information, Aetna notified him via letter on December 6, 2009, that it had "closed" his claim effective December 1, 2009.[26]

Aetna received an updated APS on February 10, 2010.[27]  Dr. Vrooman reported that he believed Shedrick was still disabled, had "[n]o ability to work," and that his primary diagnosis was "low back pain."[28]  Dr. Vrooman also noted that Shedrick had been prescribed Vicoden for his pain and that this type of medication "can impair mental function."[29]  Shedrick's next medical appointment was scheduled for March 10, 2010.[30]  After reviewing the new documentation, Aetna initially extended Shedrick's STD benefits through March 9, 2010, but it also referred the claim to "Voc for review."[31]

Following the vocational review of Shedrick's most recent benefits assessment, Aetna informed him that more information would be needed in order to determine whether he was eligible to continue to receive STD benefits.[32]  Shedrick's file contained a note stating that the typical duration of and recovery for his type of injury is seven to twenty-one days, up to a maximum of fifty-six days.[33]  While the claims administrator believed that it was reasonable to find that Shedrick's disability persisted through February 1, 2010, based on the MRI results, she observed that his "recovery [was] prolonged" and that his attending physician reported "limited

---

[25] JE 226.
[26] JE 225.
[27] JE 92-93.
[28] JE 207-208.
[29] JE 207-208.
[30] JE 207-208.
[31] JE 95.
[32] JE 100.
[33] JE 104.

exam findings (post MRI)" and had prescribed "limited treatment."[34]  Consequently, Aetna requested Shedrick's job description, the identity of Shedrick's current attending physician,[35] the treatment note from his last office visit, the date of his next office visit, the current treatment that he was receiving, and his office visit note from Dr. Scott Rushtin ("Dr. Rushtin").[36]  Shedrick was also informed that as of that time, he would not be eligible for benefits beyond February 1, 2010, unless he provided the requisite information.[37]

Shedrick complied with Aetna's requests on March 4, 2010.[38]  Shedrick's New Orleans physician, Dr. John Watermeier ("Dr. Watermeier"), stated that in his opinion Shedrick was "totally, temporarily disabled."[39]  In his APS, Dr. Watermeier wrote that Shedrick was experiencing "mild pain in the cervical area," "moderate pain in the lumbar area," "mild spasms" and "limitation [of] motion."[40]  Rather than select the level of work activity that Shedrick could withstand, Dr. Watermeier stated that Shedrick was "temporarily disabled pending completion of workup."[41]

Aetna reviewed Shedrick's supplemental medical records and found them insufficient to "support ongoing impairment beyond 02/01/2010."[42]  The claims administrator based her opinion on Shedrick's diagnosis given the "limited current medical [information]," the lack of information as to actual treatment or response to such treatment, and the lack of information

---

[34] JE 104.
[35] It was unclear to Aetna whether Shedrick was being treated in Pennsylvania or Louisiana.  JE 100.
[36] JE 100.
[37] JE 100.
[38] JE 112, 116-117, 121-122, 141-143 and 190-201.
[39] JE 162.
[40] JE 191-192.
[41] JE 191-192.
[42] JE 651-652.

regarding Shedrick's physical restrictions and limitations.[43]  Aetna informed Shedrick by letter

on March 4, 2010, that Aetna would evaluate "any additional information" he wished to submit,

"including but not limited to":

> -a detailed narrative report for the period that you are claiming disability;
>
> -specific physical and/or mental limitations related to your condition that your doctor has placed on you as far as gainful activity is concerned; physician's prognosis, including course of treatment, frequency of visits, and specific medications prescribed;
>
> -diagnostic studies conducted during the above period, such as test results, X-rays, laboratory data, and clinical findings;
>
> -any information specific to the condition(s) for which you are claiming total disability that would help us evaluate your disability status; and
>
> -any other information or documentation you think may help in reviewing your claim.[44]

Shedrick consequently furnished more medical information from Dr. Watermeier.  The claims

administrator reviewed the records and noted that Dr. Watermeier believed that Shedrick's

disability was ongoing, but that he provided no treatment plan, "no details as to what [the] work

up" revealed and he did not indicate whether he performed any testing.[45]  Accordingly, the

claims administrator did not extend Shedrick's benefits eligibility.[46]

Because Aetna anticipated that Shedrick's claim would transition from one for STD

benefits to one for LTD benefits, the claims administrator created a LTD benefits claim file for

---

[43] JE 116.  The claims administrator also found that it was unclear whether Shedrick attended the recommended physical therapy.  JE 115.
[44] JE 651-652.
[45] JE 122.
[46] JE 122.

Shedrick on March 26, 2010.[47]  Shedrick further supplemented his medical records.  Dr.
Watermeier supplied an APS dated April 7, 2010, writing that Shedrick was experiencing
symptoms of "muscle spasm, limited mtion [sic], mild pain in cervical area, moderate pain in
lumbar area."[48]  However, Dr. Watermeier did not list whether Shedrick had any physical
restrictions.[49]  The claims administrator determined that there was a "lack of measurable,
quantifiable finkdings [sic] by physical examination or diagnostic test resulsts [sic]" to support a
finding that he could not perform light duty work.[50]

 Aetna asked Shedrick to undergo a vocational assessment with vocational counselor
Mario Scopacasa ("Scopacasa").[51]  In his report dated May 4, 2010, Scopacasa concurred that
Shedrick's job corresponded with DOT code 950.131-014[52] and he concluded that he was likely
not ready to return to work because of his "[c]urrent physical restrictions" and his "reliance on
pain medications."[53]  However, Scopacasa also acknowledged that Shedrick "view[ed] himself
as disabled despite his very active lifestyle."[54]  He believed that Shedrick was "focused on
enjoying his current lifestyle," which included "assist[ing] his 'lady friend' in her real estate

---

[47] JE 125 and 242.  As noted *supra*, for the first twenty-four months following onset of disability the test for STD
and LTD benefits are identical in that a claimant must only be prevented from performing his own job in order to be
considered "disabled."  Whether a claimant qualifies for STD versus LTD depends upon whether or not he satisfies
the requisite elimination period – either 8 or 182 days, respectively.  At the time that Aetna created Shedrick's LTD
benefits claim file, Shedrick needed to wait approximately 45 more days before he satisfied the LTD benefits
elimination period.  *See* n.2.

[48] JE 265.
[49] JE 267.
[50] JE 267.
[51] JE 259.
[52] JE 574.
[53] JE 575.
[54] JE 575.

work."[55] Scopacasa recommended that Shedrick receive a pain management evaluation in order to wean him off his pain medications.[56]

Shedrick further supplemented his medical records. On May 27, 2010, the claims administrator again found that Dr. Watermeier's diagnosis lacked "supporting medical information." [57] Aetna denied Shedrick's claim.[58]

Shedrick returned to Dr. Watermeier for another appointment on June 4, 2010. Dr. Watermeier reported that Shedrick needed "to avoid repetitive stooping or bending and repetitive lifting of objects over 10-20 pounds as well as prolonged sitting or standing in the same position for 45 minutes, plus/minus 15 minutes without being able to move around or change position."[59] The claims administrator concluded that, because Shedrick performed a "light" occupation, his occupational demands were not greater than the restrictions and limitations that Dr. Watermeier articulated. Accordingly, Aetna concluded that Shedrick could perform his own occupation and it denied his claim.[60] Aetna informed Shedrick of his right to appeal the benefits denial.[61]

Shedrick thereafter requested a copy of his claims file and a copy of the disability policy.[62] Aetna shipped the documents to Shedrick via UPS on September 3, 2010.[63] Shedrick also retained counsel on September 1, 2010. His attorney demanded an appeal of Shedrick's benefits denial and provided certain medical records.[64] Aetna reviewed these records and

---

[55] JE 574-575.
[56] JE 575.
[57] JE 277-280.
[58] JE 277-280.
[59] JE 438.
[60] JE 282.
[61] JE 280.
[62] JE 553-554.
[63] JE 285.
[64] JE 286 and 537-541.

observed that they were documents that previously had been reviewed.[65]  Consequently, the claims administrator inquired whether Shedrick's attorney planned to submit any further medical information.[66]  On October 20, 2010, the claims administrator noted that she received a return phone call from the attorney "and was informed that as of 10/6/2010, [Aetna] had all of the additional information that was to be submitted [with respect to] the appeal."[67]  This was confirmed to Shedrick's attorney in a subsequent letter dated November 19, 2010.[68]

Nevertheless, Shedrick's attorney submitted forty-seven additional pages to Aetna on December 9, 2010.[69]  The attorney also provided a functional work capacity evaluation ("WCE") on December 14, 2010. [70]  In the WCE dated October 20, 2010, Dr. Watermeier stated that Shedrick could sit for two hours, walk for one hour, stand for one hour, twist for 30 minutes, operate a motor vehicle at work for two to four hours, and operate a motor vehicle to/from work for two to four hours per day.[71]  He did not indicate how much weight Shedrick could push, pull or lift.[72]

Aetna assigned Shedrick's claims file to Dr. James Wallquist ("Dr. Wallquist") for review on December 30, 2010.[73]  Dr. Wallquist examined Shedrick's medical records and spoke with Dr. Vrooman and Dr. Watermeier by telephone on January 3, 2011.[74]  Dr. Vrooman stated

---

[65] JE 289.
[66] JE 293.
[67] JE 294 and 297.
[68] JE 619.
[69] JE 301 and 433-479.
[70] JE 301 and 428-430.
[71] JE 429.
[72] JE 429.
[73] JE 302-305.
[74] JE 425.

that he had no opinion regarding Shedrick's disability status after Shedrick's last office visit with

Dr. Vrooman on February 1, 2010.[75]

Dr. Watermeier stated that he had last seen Shedrick on December 6, 2010, and that at

that time Shedrick had "expressed subjective back and hip pain and was using a walking cane for

external support."[76]  Moreover,

> The physical exam revealed moderate pain with range of motion.  [Shedrick had]
> 75% of flexion and 10°-20° of rotation.  Tension signs were not tested.  No
> neurological deficit was recorded.  [Shedrick] was diagnosed with lumbar spinal
> stenosis.  It was felt that [Shedrick's] condition was stable.  No surgery was
> recommended.  [Shedrick] did not have [a] pain management evaluation or
> treatment.  [Shedrick] was to continue on Neurontin, [a] walking cane, and Xodol,
> a narcotic.[77]

Dr. Watermeier's opinion was that Shedrick was unable to perform his own occupation "for the

entire time frame under consideration."[78]

Based on his discussions with Doctors Vrooman and Watermeier, and Shedrick's medical

records, Dr. Wallquist opined that there was

> [A] lack of "significant objective" clinical documentation by physical
> examination to correlate with the diagnostics and [Shedrick's] subjective
> complaints to support a functional impairment that would preclude [Shedrick]
> from performing the core elements of his own occupation described as a Director
> of Engineering Operations for Marriott, a light physical demand category
> requiring the ability to occasionally lift 20 pounds maximum from 11/9/09
> through 12/30/09.[79]  The restrictions and limitations assigned by Dr. Watermeier
> on 6/4/10 indicated [Shedrick] was capable of lifting 10-20 pounds, which is in
> compliance with a light physical demand level.[80]

---

[75] JE 425.

[76] JE 425.

[77] JE 425.

[78] JE 425.

[79] This date appears to be a typo in Dr. Wallquist's report.  All of Dr. Wallquist's other references to the timeframe of Shedrick's physical limitations state that the timeframe of consideration ended on December 30, 2010.  *See* JE 426.

[80] JE 425.

Furthermore, he observed that "[t]here was no indication by clinical testing that [Shedrick] was experiencing any cognitive impairment that would impact [his] ability to work for the time frame under consideration."[81]  Finally, Dr. Wallquist concluded that his review would not support extending further benefits to Shedrick.[82]  Aetna, by letter dated January 6, 2011, notified Shedrick that it was denying his appeal and it upheld its original decision to deny benefits.[83]

In response to Aetna's denial letter, Shedrick's attorney provided Aetna with a note from Dr. Watermeier stating that Shedrick was "totally impaired" and copies of his prescriptions for Xodol, Neurontin and Citalopram on January 14, 2011.[84]  He also submitted a supplemented copy of Shedrick's job description and descriptions of the side effects of Xodol and Neurontin.[85]  A vocational rehabilitation consultant reviewed the supplemental occupational demands information and again concluded that Shedrick's job required a light physical demand level.[86]  Consequently, Aetna reiterated by a letter dated April 7, 2011, that Shedrick had exhausted his appeal procedures under the plan and it explained his right to file a lawsuit.[87]

On March 10, 2011, Shedrick initiated the above-captioned lawsuit, then titled *Burnell Shedrick v. Marriott and Aetna Life Insurance Company* (Case Number 2011-2555), in the Civil District Court for the Parish of Orleans, State of Louisiana.[88]  Defendants removed the case to the U.S. District Court for the Eastern District of Louisiana on April 13, 2011.[89]  Defendants asserted that this Court had federal question jurisdiction pursuant to 28 U.S.C. § 1331 because

---

[81] JE 426.
[82] JE 421-426.
[83] JE 615-616.
[84] JE 308 and 404-411.
[85] JE 316-360.
[86] JE 680.
[87] JE 680.
[88] R. Doc. No. 1.
[89] R. Doc. No. 1.

the plan is an employee welfare benefit plan within the meaning of ERISA.  As such, defendants

contended that Shedrick's claims arise under Section 502(a)(1)(B) of ERISA, 29 U.S.C. §

1132(a)(1)(B).  *See Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 53-54, 107 S.Ct. 1549, 95

L.Ed.2d 39 (1987).  Defendants also alleged that this Court had diversity jurisdiction pursuant to

28 U.S.C. § 1332 because, at the time the lawsuit was filed, Shedrick was a citizen of Louisiana

and defendants were not,[90] and the damages Shedrick was seeking exceeded $75,000 exclusive

of costs and interest.  Shedrick did not oppose removal or seek remand.

Shedrick's petition alleges that medical evidence establishes that he is disabled and

unable to perform – with or without reasonable accommodation – any reasonable occupation and

that defendants arbitrarily and capriciously denied disability benefits owed to him under the

plan.[91]  He contends that he is entitled to past due disability benefits, as well as continuing and

future disability benefits per the plan.[92]  Shedrick also seeks general and equitable damages that

are just and reasonable due to defendants' alleged breach of contract for arbitrarily and

capriciously denying his benefits claim.[93]  Finally, Shedrick asserts that defendants are liable to

him for attorneys' fees and penalties, including penalties pursuant to La. Rev. Stat. § 22:1973.[94]

In his motion for summary judgment, Shedrick argues that he submitted sufficient

medical records to support his disability benefits claim, that his benefits were arbitrarily and

capriciously denied because there was no evidence that he was capable of returning to work, and

---

[90] Marriott is a foreign corporation incorporated under the laws of Delaware with its principal place of business in Maryland.  Aetna is a foreign corporation incorporated under the laws of, and with its principal place of business in, Connecticut.  R. Doc. No. 1, p. 3.

[91] R. Doc. No. 1-1, ¶¶ VII-XL.
[92] R. Doc. No. 1-1, ¶ XIV.
[93] R. Doc. No. 1-1, ¶¶ XV-XVII.
[94] R. Doc. No. 1-1, ¶ XVIII.

that defendants arbitrarily and capriciously relied on the opinion of an Aetna staff physician in order to deny his benefits claim.[95]   In their motion for summary judgment, defendants counter that they correctly interpreted the plan, that Shedrick failed to comply with the plan's terms in order to qualify for disability benefits, and that their decision to deny Shedrick's claim is supported by the medical evidence in the record.[96]

### STANDARDS OF LAW

**I.      Summary Judgment**

Summary judgment is proper when, after reviewing "the pleadings, the discovery and disclosure materials on file, and any affidavits," the court determines there is no genuine issue of material fact.  Fed. R. Civ. P. 56(c).  The party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party seeking summary judgment need not produce evidence negating the existence of material fact, but need only point out the absence of evidence supporting the other party's case. *Celotex*, 477 U.S. at 323; *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195 (5th Cir. 1986).

Once the party seeking summary judgment carries its burden pursuant to Rule 56(c), the other party must come forward with specific facts showing that there is a genuine issue of material fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The showing of a genuine issue is not satisfied by creating " 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' 'unsubstantiated

---

[95] R. Doc. No. 24-1.
[96] R. Doc. No. 23-1.

assertions,' or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994) (citations omitted). Instead, a genuine issue of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party responding to the motion for summary judgment may not rest upon the pleadings, but must identify specific facts that establish a genuine issue. *Id.* The nonmoving party's evidence, however, "is to be believed, and all justifiable inferences are to be drawn in [the nonmoving party's] favor." *Id.* at 255; *see Hunt v. Cromartie*, 526 U.S. 541, 552, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999).

## II.      ERISA

ERISA permits a beneficiary of a welfare plan to initiate legal action to "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Nevertheless, judicial review of a plan administrator's benefits determination is not limitless, but limited. Reviewing courts are required to show a certain amount of deference to administrative determinations because, as the U.S. Supreme Court recently reiterated:

> Deference promotes efficiency by encouraging resolution of benefits disputes through internal administrative proceedings rather than costly litigation. It also promotes predictability, as an employer can rely on the expertise of the plan administrator rather than worry about unexpected and inaccurate plan interpretations that might result from *de novo* judicial review. Moreover, *Firestone*[, *infra*,] deference serves the interest of uniformity, helping to avoid a patchwork of different interpretations of a plan, like the one here, that covers employees in different jurisdictions – a result that "would introduce considerable inefficiencies in benefit program operation, which might lead those employers with existing plans to reduce benefits, and those without such plans to refrain from adopting them." *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 11, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987). Indeed, a group of prominent actuaries tells us

14

that it is impossible even to determine whether an ERISA plan is solvent (a duty imposed on actuaries by federal law, see 29 U.S.C. §§ 1023(a)(4), (d)) if the plan is interpreted to mean different things in different places. See Brief for Chief Actuaries as *Amici Curiae* 5-11.

*Conkright v. Frommert*, ___ U.S. ___, 130 S.Ct. 1640, 1649, 176 L.Ed.2d 469 (April 21, 2010).

## A.   Standard of Review for Policy Interpretations

A court must review a denial of ERISA benefits under a *de novo* standard "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *Wegner v. Standard Ins. Co.*, 129 F.3d 814, 818 (5th Cir. 1997). If a plan "gives the Plan Administrator the discretionary authority to construe the Plan's terms and to render benefit decisions," then a court must review the administrator's decisions subject to an abuse of discretion standard. *Holland v. Int'l Paper Co. Ret. Plan*, 576 F.3d 240, 246 (5th Cir. 2009). The plan granted Aetna such discretionary authority and, consequently, the Court will review Aetna's policy interpretations to resolve whether Aetna abused its discretion in denying Shedrick's claim.[97]

The Fifth Circuit has outlined a "two-step analysis in determining whether a plan administrator abused its discretion in construing plan terms." *Vercher v. Alexander & Alexander Inc.*, 379 F.3d 222, 227 (5th Cir. 2004) (citing *Rhorer v. Raytheon En'rs & Const'rs, Inc.*, 181 F.3d 634, 639 (5th Cir. 1999)). As the Fifth Circuit recently explained in *Stone v. UNOCAL Termination Allowance Plan*, 570 F.3d 252, 257 (5th Cir. 2009):

First, we determine whether the [administrator's] determination was legally correct. [*Crowell v. Shell Oil Co.*, 541 F.3d 295, 312 (5th Cir. 2008)]. If so, the inquiry ends and there is no abuse of discretion. *Id.* Alternatively, if the court

---

[97] JE 63.

finds the administrator's interpretation was legally incorrect, the court must then determine whether the administrator's decision was an abuse of discretion. *Id.*; *Aboul-Fetouh v. Employee Benefits Comm.*, 245 F.3d 465, 472 (5th Cir. 2001). Only upon reaching this second step must the court weigh as a factor whether the administrator operated under a conflict of interest. *See White*, slip op. at 1-2; *Crowell*, 541 F.3d at 312.

*Stone*, 570 F.3d at 257.

In determining whether an administrator's interpretation is legally correct, a court must consider three factors: " '(1) whether the administrator has given the plan a uniform construction, (2) whether the interpretation is consistent with a fair reading of the plan, and (3) any unanticipated costs resulting from different interpretations of the plan.' " *Id.* at 258 (quoting *Crowell*, 541 F.3d at 312). The most important factor in this analysis is "whether the administrator's interpretation was consistent with a fair reading of the plan." *Id.* (citing *Crowell*, 541 F.3d at 313). If a court finds that the administrator's interpretation was not legally correct, then it must resolve whether an administrator has abused its discretion.

A plan administrator abuses his discretion where the decision is not " 'based on evidence, even if disputable, that clearly supports the basis for its denial.' " *Lain v. UNUM Life Ins. Co. of Am.*, 279 F.3d 337, 342 (5th Cir. 2002) (quoting *Vega v. Nat'l Life Ins. Servs., Inc.*, 188 F.3d 287, 299 (5th Cir. 1999) (en banc)). A court must find that an administrator has abused its discretion only when "the plan administrator acted arbitrarily or capriciously." *Holland*, 576 F.3d at 246 (quoting *Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc.* 168 F.3d 211, 214 (5th Cir. 1999)). "A decision is arbitrary only if made without a rational connection between the known facts and the decision or between the found facts and the evidence." *Id.* (citing *Meditrust*, 168 F.3d at 215)). A court's "review of the administrator's decision need not be particularly complex or technical; it need only assure that the administrator's decision fall somewhere on a

continuum of reasonableness – even if on the low end." *Id.* at 247 (quoting *Corry v. Liberty Life Assurance Co. of Boston*, 499 F.3d 389, 398 (5th Cir. 2007) (internal quotation marks omitted)).

When analyzing whether an administrator has abused its discretion in its interpretation of the plan, a court must weigh four factors: (1) the plan's internal consistency under the administrator's interpretation, (2) any relevant regulations, (3) the factual background underlying the decision, and (4) any indication of lack of good faith. *Lain*, 279 F.3d at 346. Furthermore, if the administrator has a conflict of interest, the court must "weigh the conflict of interest as a factor in determining whether there is an abuse of discretion in the benefits denial, meaning we take account of several different considerations of which conflict of interest is one." *Holland*, 576 F.3d at 247 (quoting *Crowell*, 541 F.3d at 312 (quotation marks and footnotes omitted) (quoting *Metropolitan Life Ins. Co. v. Glenn*, 128 S. Ct. 2343, 2350-51 (2008))).

With respect to how an administrator's conflict of interest must be accounted for when embarking on an abuse of discretion review, the U.S. Supreme Court in *Glenn* eschewed "special burden-of-proof rules, or other special procedural or evidentiary rules, focused narrowly upon the evaluator/payor conflict." *Id.* (quoting *Glenn*, 128 S. Ct. at 2351). Rather, the Supreme Court held that weighing a conflict of interest as a factor does not "impl[y] a change in the *standard* of review, say, from deferential to *de novo* review." *Id.* (footnote omitted) (quoting *Glenn*, 128 S. Ct. at 2350). "Quite simply, 'conflicts are but one factor among many that a reviewing judge must take into account.' " *Id.* at 247-48 (quoting *Glenn*, 128 S. Ct. at 2351).

### B.   Standard of Review for Factual Determinations

A plan administrator's factual determinations "are always reviewed for abuse of discretion." *Vercher*, 379 F.3d at 226. When "a challenge to a denial of benefits . . . disputes

whether an individual's conditions qualify as a disability, the inquiry involves factual

determinations." *McDonald v. Hartford Life Group Ins. Co.*, 361 Fed. App'x 599, 607 (5th Cir.

2010) (citing *Wade v. Hewlett-Packard Dev. Co. LP Short Term Disability Plan*, 493 F.3d 533,

540 (5th Cir. 2007)).  Again, a plan administrator's decision to deny benefits must be " 'based on

evidence, even if disputable, that clearly supports the basis for its denial.' "  *Lain*, 279 F.3d at

342 (quoting *Vega*, 188 F.3d at 299).  If the administrator's decision to deny a claim is supported

by " 'some *concrete evidence* in the administrative record,' " the administrator did not abuse its

discretion.  *Id.* (quoting *Vega*, 188 F.3d at 302) (emphasis in original).  A reviewing court cannot

substitute its judgment for that of the plan administrator.  *McDonald*, 361 Fed. App'x at 608

(citing *Wade*, 493 F.3d at 541).  The Court may consider whether Aetna, in its dual role as

insurer and plan administrator, had a conflict of interest that affected the benefits determination.

*Id.*

## ANALYSIS

While the heart of Shedrick's claims turn on whether Aetna abused its discretion in

making certain factual determinations, three of Shedrick's arguments do implicate the propriety

of certain plan interpretations.  As such, the Court begins with an analysis of Aetna's policy

interpretations before turning to the disputed factual determinations.

### I.    Policy Interpretations

Shedrick's arguments which implicate the propriety of Aetna's plan interpretations are:

(1) whether Aetna had the burden to prove that Shedrick was not disabled,[98] (2) whether it was

---

[98] R. Doc. No. 24-1, pp. 12-14.

Aetna's responsibility to obtain medical records pertinent to Shedrick's claim,[99] and (3) whether Aetna was required to have Shedrick examined by an "independent" physician before denying his claim.[100]

With respect to disputed policy interpretations, the Court must examine: (1) whether Aetna gave the plan a uniform construction, (2) whether Aetna's interpretation is consistent with a fair reading of the plan, and (3) whether there would be any unanticipated costs incurred as a result of a different interpretation of the plan. *Stone*, 570 F.3d at 258.[101]

The first factor – whether a plan administrator has given the plan a "uniform construction" – of the legally correct interpretation analysis scrutinizes whether the administrator consistently applied the plan to similarly situated persons covered under the policy. *Stone*, 570 F.3d at 258; *see also Crowell*, 541 F.3d at 314 and 314 n.83; *Batchelor v. Int'l Broth. of Elec. Workers Local 861*, 877 F.2d 441, 444-45 (5th Cir. 1989). Shedrick has not alleged that Aetna has inconsistently applied the plan to similarly situated persons – that is, that any similarly situated persons who sought benefits (1) were not required to prove that they were disabled under the plan, (2) were not required to provide pertinent medical records supporting their claims to Aetna, or (3) were required to be examined by an "independent" physician when compared to Shedrick. *Stone*, 570 F.3d at 259. Shedrick has also not provided any evidence with respect these arguments. Where there is no evidence that applicable provisions of a plan "have been

---

[99] R. Doc. No. 24-1, p. 6.

[100] R. Doc. No. 33, pp. 13-16.

[101] Shedrick argues that the Court must consider Aetna's purported conflict of interest because it is an insurance carrier also serving as the claims administrator. R. Doc. No. 33-1, pp. 8-9. However, the Court notes that, following Fifth Circuit precedent, consideration of such a conflict only informs a court's analysis if the court determines that the administrator's interpretation of the plan is not legally correct. *Stone*, 570 F.3d at 257-58. Because the Court finds that Aetna's interpretations of the plan were "legally correct," it does not consider Aetna's purported conflict of interest at the plan interpretation stage in this analysis.

interpreted in light of claims" like Shedrick's, this factor is viewed as "neutral."  *Tolson v.
Avondale Indus.*, 141 F.3d 604, 608 (5th Cir. 1998).  Accordingly, the Court will not draw any
inferences in favor of either party regarding this factor.

As stated, the second factor – whether the plan administrator's interpretation is consistent
with a "fair reading of the plan" – is the most important factor in the legally correct interpretation
analysis.  *Stone*, 570 F.3d at 260 (citing *Crowell*, 541 F.3d at 313).  The heart of Shedrick's three
arguments regarding Aetna's alleged contractual responsibilities go to whether Aetna's
interpretations are consistent with a "fair reading" of the policy.[102]  First, Shedrick argues that
Aetna had the burden to prove that Shedrick was not disabled before it could deny his disability
claim.  Second, he asserts that it was Aetna's responsibility to obtain medical records pertinent to
Shedrick's claim.  Third, Shedrick contends that Aetna was required to have him examined by an
"independent" physician before denying his claim.

With respect to whether a plan administrator's interpretation is consistent with a "fair
reading" of a plan, the Fifth Circuit has stated that "eligibility for benefits is governed in the first
instance by the plain meaning of the plan language."  *Stone*, 570 F.3d at 260 (internal quotations
omitted).  "ERISA plans are interpreted in their ordinary and popular sense as would a person of
average intelligence and experience."  *Id*.  "Thus, plan provisions must be interpreted as they are
likely to be understood by the average plan participant."  *Id.*

The plan sets forth many scenarios in which a claimant will not qualify for benefits.  The
plan provides that beneficiaries "will no longer be considered as disabled nor eligible for long
term disability benefits when the first of the following occurs":

---

[102] R. Doc. Nos. 33-1, pp. 4-5 and 37, pp. 4-5.

-The date you no longer meet the LTD **test of disability**, as determined by Aetna.

-The date you are no longer under the regular care of a **physician**.

-The date **Aetna** finds you have withheld information about working, or being able to work, at a **reasonable occupation**.

-The date you fail to provide proof that you meet the LTD **test of disability**.

-The date you refused to be examined by or cooperate with an independent **physician** or a licensed and certified health care practitioner, as requested.  **Aetna** has the right to examine and evaluate any person who is the basis of your claim at any reasonable time while your claim is pending or payable.  The examination or evaluation will be done at **Aetna's** expense.

-The date an independent medical exam report or functional capacity evaluation does not, in Aetna's opinion, confirm that you are disabled.

-The date you reach the end of your Maximum Benefit Duration, as shown in the *Schedule of Benefits*.

-The date you refuse to cooperate with or accept:
- -Changes to your work site or job process designed to suit your identified medical limitations; or
- -Adaptive equipment or devices designed to suit your identified medical limitations; which would allow you to work at your **own occupation** or a **reasonable occupation** (if you are receiving benefits for being unable to work any **reasonable occupation**) and provided that a **physician** agrees that such changes, adaptive devices or equipment suit your particular medical limitations.

-The date you refuse any treatment recommended by your attending **physician** that, in **Aetna's** opinion, would cure, correct or limit your disability.

-The date your condition would permit you to:
- -Work; or
- -Increase the hours you work; or
- -Increase the number or type of duties you perform in your own occupation

But you refuse to do so.

-The date of your death.

-The day after **Aetna** determines that you can participate in an **approved rehabilitation program** and you refuse to do so.[103]

The plain meaning of the plan language indicates that Shedrick must continue to satisfy the plan's terms in order to qualify for benefits.  At the moment that he fails one of the above criteria, he is no longer eligible for benefits under the plan.  The Court finds that this language does not impose any duty upon Aetna to affirmatively disprove that Shedrick is disabled before it may deny his claim.

Likewise, the plan does not dictate that Aetna has the responsibility to obtain Shedrick's medical records.  Shedrick cites the plan's language stating "[y]ou must also provide Aetna with authorizations to allow it to investigate your claim . . ."[104] as the basis for Aetna's purported duty.[105]  The cited sentence is extracted from the following paragraph:

> Your claim must give proof of the nature and extent of the loss.  You must furnish true and correct information as **Aetna** may reasonably request.  At any time, **Aetna** may require copies of the documents to support your claim, including data about employment.  You must also provide **Aetna** with authorizations to allow it to investigate your claim and your eligibility for and the amount of work earnings and other income benefits.[106]

When read in context, the paragraph clearly indicates that it is Shedrick's duty to "*give proof of the extent and nature of the loss*," not Aetna's.[107]  Federal and state privacy laws regarding medical information[108] require entities such as Aetna to have authority from plan beneficiaries, granting them access to their medical records, before they may contact health care providers

---

[103] JE 9-10 (bold in original).
[104] JE 22.
[105] R. Doc. No. 24-1, p. 6.
[106] JE 20 (bold in original).
[107] JE 20 (emphasis added).
[108] For example, the Health Insurance Portability and Accountability Act of 1996 ("HIPAA," Pub.L. 104-191, 110 Stat. 1936, enacted August 21, 1996).

about such records.  If Aetna did not have Shedrick's authorization, Aetna could not discuss his disability status with his health care providers.[109]  Other language in the plan further underscores that it is Shedrick's duty to supply all needed documents to Aetna.  The plan emphasizes that benefit eligibility ends when a claimant "fail[s] to provide proof" of his disability[110] and otherwise provides that the "[p]olicyholder will furnish to [Aetna], on a monthly basis (or as otherwise required), such information as [Aetna] may reasonably require to administer [the plan]."[111]  The Court finds that the plain language of the plan places the burden on Shedrick to supply all necessary records to Aetna for his benefits determination.

Finally, Shedrick misinterprets the plan to require Aetna to have him submit to a physical exam with an independent, third-party physician.  While Aetna clearly reserves the right[112] to ask Shedrick to submit to such an exam, the plan does not require Aetna to order Shedrick to do so. The plan simply states that a claimant will no longer qualify for benefits on the date when he "refuse[s] to be examined by or cooperate with an independent **physician** or a licensed and certified health care practitioner, as requested."[113]  This provision indicates that Aetna preserves its ability to require a claimant to undergo further examination in cases of doubt.  The Court finds that the plain language does not establish a requirement that Aetna arrange for such an exam before it may deny benefits.

---

[109] *See* JE 120 ("[Spoke with] Jo-ann [at physician's office] who advised [that Aetna's] Request for updated [office visit note]/testing results was [received] however they Need Authorization form to release.  She advised they left [a voicemail] with [Shedrick] notifying [him] that [a] Release of Information form would be needed.").

[110] JE 9.

[111] JE 58.

[112] JE 9 ("**Aetna** has the right to examine and evaluate any person who is the basis of your claim at any reasonable time while your claim is pending or payable.") (bold in original).

[113] JE 9 (bold in original).

The third factor of the "legally correct" analysis weighs whether a claimant's plan interpretations would result in unanticipated costs to the plan.  *Stone*, 570 F.3d at 258.  Aetna has produced the declaration of Carole M. Roy ("Roy"), Aetna's senior technical specialist, wherein Roy states under penalty of perjury that Shedrick's plan interpretations "would result in significant and unnecessary additional costs of the Plan."[114]  The Court agrees that Shedrick's plan interpretations would likely result in increased costs to the plan because Shedrick seeks to impose additional duties upon Aetna that, based upon a "fair reading" of the plan, the plan does not require.  For example, mandating that Shedrick must undergo a physical examination by a third-party physician, when the plan language does not specify that claimants *must* undergo such an examination, would obligate Aetna to pay for an additional office visit.  At the same time, Shedrick has not argued that his plan interpretations would *not* result in increased costs to the plan.  The Court finds that this factor favors Aetna.

Accordingly, the Court concludes that Aetna's interpretations of the plan at issue are all legally correct.  Aetna did not abuse its discretion in interpreting the plan.  *Stone*, 570 F.3d at 257.

## II.     Factual Determinations

The bulk of Shedrick's arguments are directed at establishing that Aetna abused its discretion in its factual determinations – *i.e.*, in finding that Shedrick was not disabled and thus entitled to benefits under the plan.  As the Court previously stated, whether a claimant is "disabled" is a factual determination that is reviewed for abuse of discretion.  *McDonald*, 361 Fed. App'x at 607.  Furthermore, Shedrick is correct that Aetna's dual role as the insurer and

---

[114] R. Doc. No. 31, p. 2.

plan administrator implicates a potential conflict of interest.  Following the U.S. Supreme

Court's decision in *Glenn*, as set forth *supra*,[115] a plan administrator's purported conflict of

interest does not change the standard of review, but acts as a single factor that courts must weigh

when reviewing benefits determinations.  *Holland*, 576 F.3d at 247 (quoting *Glenn*, 128 S. Ct. at

2350-51).

The Fifth Circuit has stated that "[i]f claimants do not present evidence of the degree of

the conflict, the court will generally find that any conflict is 'not a significant factor.' "

*McDonald*, 361 Fed. App'x at 608 (citing *Holland*, 576 F.3d at 249 ("finding that where

claimant 'adduced no evidence . . . that [administrator's structural] conflict affected its benefits

decision or that it had a history of abuses of discretion,' any conflict was insignificant in abuse of

discretion analysis")).  The only "evidence" that Shedrick has put forth with respect to Aetna's

purported conflict of interest is the history of Dr. Wallquist, the physician who conducted the

final review of Shedrick's claims file.  Shedrick argues that Aetna utilizes Dr. Wallquist to

perform this "exact same hatch job" whenever Aetna wants to deny a benefits claim due to too

little objective evidence in the record.[116]  Shedrick has provided the Court with an order from the

U.S. District Court for the Eastern District of Pennsylvania where, according to Shedrick, Dr.

Wallquist was found to be "incredible, unreliable and a 'staff physician.' "[117]  The Court has

reviewed that order.  *See Harper v. Aetna Life Ins. Co.*, 2011 WL 1196860 (E.D. Pa. March 31,

2011).

---

[115] *See* p. 17.
[116] R. Doc. No. 24-1.
[117] R. Doc. No. 33, p. 15.

In *Harper*, the plaintiff, Carol Harper, injured her back and filed a claim for disability benefits.  *Harper*, 2011 WL 1196860, at *1.  As he did with respect to Shedrick's file, Dr. Wallquist similarly concluded that Harper's medical records contained "insufficient physical examination findings to correlate with diagnostics and [Harper's] subjective complaints." *Harper*, 2011 WL 1196860, at *7.  The court found that Dr. Wallquist ignored or downplayed certain findings from the plaintiff's treating physician.  *Id.* at *7-9.  However, unlike in this case, the *Harper* court had the benefit of hearing the rebuttal medical opinion of the plaintiff's treating physician after Dr. Wallquist rendered his report.  The *Harper* court stated that:

> Dr. Schurtz, [the plaintiff's treating physician,] having been advised of Dr. Wallquist's opinion citing a lack of documentation, conceded that she could have 'documented it more specifically.' She explained that although she had noted full range of motion and lack of spasm, these movements were 'always with pain.' She emphatically stated that after seeing and physically examining her patient over a year and a half, she concluded that Harper was 'unable to perform her duties as a secretary, and [was] unemployable until her pain was addressed with surgery.'

> Dr. Schurtz's Summary Letter references her peer-to-peer telephone conference with Dr. Wallquist, revealing Wallquist's later mischaracterization of her findings. According to Dr. Schurtz, she 'attempted to explain that [Harper's] numbness had resolved because she has in fact not been working or sitting for hours at a time.' She also told Dr. Wallquist that 'once [Harper's] decompression therapy was halted and she started to work and sit for 8 hours per day, the numbness would return,' and that 'her employer was not accommodating her restrictions.' According to Dr. Schurtz, 'Dr. Wallquist was insistent that [Harper] was employable.' So emphatic was Dr. Schurtz to the contrary that she requested that her disagreement 'be documented' in his report. It was not.

*Harper*, 2011 WL 1196860, at *8.

This Court has not been afforded the same assistance from Shedrick's treating physicians. The administrative record contains nothing from Shedrick's treating physicians elaborating on their treatment notes following the release of Dr. Wallquist's report.  Indeed, Shedrick's medical

records contain little explanation as to why his treating physicians thought him to be disabled, other than merely stating that they believed he was "disabled."[118]

Judicial review of benefit denials are fact intensive and fact driven.  The Court cannot find that Aetna's reliance on Dr. Wallquist's report, by itself, is evidence that Aetna's conflict of interest affected Shedrick's benefits determination.  Moreover, because Shedrick has not produced evidence of the degree of Aetna's conflict, the Court finds that such conflict is an insignificant factor.  *See McDonald*, 361 Fed. App'x at 608 (citing *Holland*, 576 F.3d at 249).

Shedrick has also attached as an exhibit a copy of  the Social Security Administration's ("SSA") notice that he qualified for monthly disability benefits beginning in March, 2010.[119]  He states that he was granted these benefits "without hearing or appeal."[120]  However, nothing in the record indicates that Shedrick ever informed Aetna that he qualified for SSA disability benefits. In conducting a review of whether a plan administrator abused its discretion, courts are limited to examining the evidence in the administrative record that was before the administrator when the benefits determination was made.  *Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 314 (5th Cir. 2007); *Vega*, 188 F.3d at 289, 299 ("Once the administrative record has been determined, the district court may not stray from it except for certain limited exceptions.  To date, those exceptions have been related to either interpreting the plan or explaining medical terms and

---

[118] *See, e.g.*, office visit note from Dr. Watermeier stating, in its entirety, that Shedrick's impairment status is "Total Impairment."  JE 405.  The contents of Shedrick's medical records are discussed, *infra*, at pp. 31-32.

[119] R. Doc. No. 24-2, pp. 5-7.

[120] R. Doc. Nos. 24-1, p. 3 and 33, p. 4.

procedures relating to the claim.").[121]  Consequently, the Court cannot consider the fact that the SSA has awarded Shedrick disability benefits.

Shedrick further contends that "the seminal moment when Aetna decided that no record Mr. Shedrick submitted was sufficient to support his claim for disability" was when a claims administrator finally realized that he earned $22,736.96 per month before taxes.[122]  The Court observes that from the time that Aetna first approved Shedrick's benefits in November 2009, Aetna calculated his weekly gross benefit to be $1,656.96 and informed Shedrick of that information in a letter dated November 30, 2009.[123]  Aetna noted again on February 22, 2010, at the same time the claims administrator recorded that Shedrick's gross salary was $22,736.96 per

---

[121] *See also Marrs v. Prudential Ins. Co. of Am.*, 444 Fed App'x 75, 77-78 (5th Cir. 2011), stating:

> [Plaintiff] contends that her approval for Social Security disability benefits proves that Prudential's denial of her long-term disability benefits was an abuse of discretion. There are at least two problems with this argument. First, there is no evidence in the administrative record to support it, and our review is limited to the administrative record. *Estate of Bratton v. Nat'l Union Fire Ins. Co.,* 215 F.3d 516, 521 (5th Cir. 2000). Second, no evidence of any contrary Social Security Administration determination was submitted to Prudential's plan administrator when it denied [plaintiff's] benefits. In fact, there is no evidence that a contrary Social Security disability benefits decision had even been rendered at the time the plan administrator determined she was ineligible for benefits. *Compare Schexnayder v. Hartford Life and Accident Ins. Co.,* 600 F.3d 465, 469 n.3 (5th Cir. 2010) (finding a contrary Social Security disability benefits determination sufficient to show procedural unreasonableness in an administrator's benefits eligibility decision where, unlike here, evidence of that contrary determination was before the administrator when it made the determination, and the plan administrator completely ignored the contrary determination), *and Hamilton v. Standard Ins. Co.,* 404 Fed. Appx. 895, 898 (5th Cir. 2010) (per curiam) (citing *Schexnayder,* 600 F.3d at 471 n.3, and explaining, in an unpublished but persuasive opinion, that a contrary Social Security Administration determination does not necessarily compel a finding of procedural unreasonableness where plan administrator acknowledged and distinguished that determination). Thus, [plaintiff's] Social Security disability benefits award does not render the contrary determination at issue here an abuse of discretion.

[122] R. Doc. No. 24-1, p. 11.

[123] JE 226.

month, that Shedrick was entitled to $1,656.96 in weekly benefits.[124]  Consequently, the Court finds this argument to be without merit.

Shedrick also suggests that Aetna's initial decision to pay Shedrick disability benefits and then to later reverse such decision is evidence that Aetna acted arbitrarily and capriciously in denying his claim.[125]  The Fifth Circuit has indicated that reversing a benefits decision is not evidence that a claims administrator abused its discretion.  *See Ellis v. Liberty Life Assurance Co. of Boston*, 394 F.3d 262, 274 (5th Cir. 2005).  As the U.S. District Court for the Western District of Louisiana has recognized, the "decision to deny LTD benefits is not an abuse of discretion by virtue of the fact that [the plan administrator] initially granted and paid benefits and later denied benefits."  *Hoffpauir v. Aetna Life Ins. Co.*, 2009 WL 1675975, at *8 (W.D. La. June 15, 2009) (citing *Ellis*, 394 F.3d at 274).  As such, this Court also finds this argument to be without merit.

Likewise, Shedrick asserts that Aetna's revision of his job status from a "medium" duty position to a "light" duty position indicates that Aetna's decision was arbitrary and capricious. Shedrick asserts that this classification does not reflect that he was responsible for "[leading] the emergency response team for all facility issues," "[ensuring that the] fire crew has complete understanding of all procedures, equipment and alarms," and "dealing with such emergencies as fire, gas line rupture, power outage, earthquakes, medical and other incidents involving possible harm to life or property."[126]

---

[124] JE 97.
[125] R. Doc. No. 24-1, pp. 5 and 11.
[126] R. Doc. No. 33, pp. 11-12.

The Court observes that Aetna's initial determination that Shedrick's job was a medium duty position was based on Shedrick self-reporting his job duties.[127]  Aetna later requested a detailed job description for his position.[128]  Aetna concluded that his job was actually a light duty position after reviewing this job description because it determined that his job was most analogous to DOT code 950.131-014.[129]

The Fifth Circuit has approved using reasonably analogous DOT job codes in order to determine a particular occupation's duty level.  *Pylant v. Hartford Life & Accident Ins. Co.*, 497 F.3d 536, 540 (5th Cir. 2007) (affirming district court's reliance on *Richards v. Hartford Life & Accident Ins. Co.*, 356 F.Supp.2d 1278, 1287 (S.D. Fla. 2004), which stated that "[w]hen the term 'occupation' is undefined, courts properly defer to the [DOT] definition of the term because insurers issuing disability policies 'cannot be expected to anticipate every assignment an employer might place upon an employee outside the usual requirements of his or her occupation.' ").[130]  The Court finds DOT code 950.131-014 reasonably analogous to justify

---

[127] JE 89.

[128] JE 117.

[129] JE 117.  DOT code 950.131-014 is defined as:

> STATIONARY-ENGINEER SUPERVISOR (any industry) alternate titles: boiler house supervisor;
>
> station supervisor; steam-station supervisor; watch engineer Supervises and coordinates activities of STATIONARY ENGINEER (any industry) and other workers operating and maintaining stationary engines and mechanical equipment, such as steam engines, air compressors, vacuum and centrifugal pumps, filters, turbines, boilers, and ventilating and refrigerating equipment. May supervise MAINTENANCE REPAIRER, INDUSTRIAL (any industry). Performs duties as described under SUPERVISOR (any industry) Master Title.
>
> GOE: 05.06.02 STRENGTH: L GED: R4 M3 L3 SVP: 7 DLU: 77

[130] The *Richards* court stated:

Aetna's reliance on it to determine that Shedrick's occupation was a light duty job.  Moreover,

the Court also notes that Scopacasa, the vocational counselor hired to interview Shedrick, also

determined that Shedrick's job should be classified as DOT code 950.131-014.[131]

Finally, Shedrick argues that Aetna abused its discretion when it relied on Dr. Wallquist's

report to deny his benefits claim, stressing that "[n]ot one single shred of evidence exists from an

examining expert that Mr. Shedrick should be denied benefits."[132]  The Court disagrees.  The

vocational counselor reported that Shedrick had a "very active lifestyle" and that he was able to

help a female friend conduct her real estate work.[133]  No treating physician reported that

Shedrick's pain medications caused him to experience any cognitive impairment.[134]  Medical

---

Even if the Policy left the term "Your Occupation" undefined, Plaintiff would still be
unsuccessful in arguing that Hartford should have evaluated her capabilities to perform her
particular tasks. When the term "occupation" is undefined, courts properly defer to the
Department of Labor's Dictionary of Occupational Title's ("DOT") definition of the term
because insurers issuing disability policies "cannot be expected to anticipate every assignment
an employer might place upon an employee outside the usual requirements of his or her
occupation." *Ehrensaft* [*v. Dimension Works Inc. Long Term Disability Plan,* 120 F.Supp.2d
1253,] 1259 (D.Nev. 2000).  *See also Dionida v. Reliance Standard Life Ins. Co.,* 50 F.Supp.2d
934, 939 n.4 (N.D.Cal. 1999) (noting that the DOT is "widely and routinely used to define
occupations in the U.S. economy" and that it is "reasonable for [claim] administrators, and
courts, to use it" in making disability determinations under ERISA); *Gallagher v. Reliance
Standard Life Ins. Co.*, 305 F.3d 264, 270-73 (4th Cir.2002) (upholding reliance on DOT as
"objectively reasonable" in ERISA action and noting that "[a] general job description of the
DOT, to be applicable, must involve comparable duties but not necessarily every duty").

*Richards*, 356 F.Supp.2d at 1287.

[131] JE 574.  Shedrick insinuates that Scopacasa was also biased in favor of Aetna when he concluded that Shedrick's
job was a light duty position.  *See* R. Doc. No. 24-1, p. 6 ("Perhaps by coincidence, the vocational counselor hired
by Aetna determined that Mr. Shedrick's job as director of engineering was a light duty position, just as an Aetna
adjuster previously suggested.").  Shedrick has produced no evidence that would support any inference that
Scopacasa was biased in favor of Aetna and, consequently, the Court rejects any suggestion that Scopacasa was
biased.  *See, e.g., Holland*, 576 F.3d at 249.

[132] R. Doc. No. 24-1, p. 20.

[133] JE 574-575.

[134] JE 426.

documents submitted from Shedrick's treating physicians indicated that he could lift 10-20 pounds, which is within the parameters of a light duty occupation.[135]  Many forms that were submitted stated treating physicians' conclusions without providing the bases for such conclusions.[136]  Other forms which could have contained pertinent information regarding the extent of his alleged disability were not completed in full.[137]

Moreover, the U.S. Supreme Court has explicitly rejected the "treating physician" rule that originates from the administrative review process regarding SSA disability benefits.  *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 829, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003). The "treating physician" rule requires "an administrator 'who rejects [the] opinions [of a claimant's treating physician] to come forward with specific reasons for his decision, based on substantial evidence in the record.' "  *Id.* at 828.  In *Black & Decker*, the U.S. Supreme Court held that "courts have no warrant to order application of a treating physician rule to employee benefit claims made under ERISA."  *Id.* at 829.

The Fifth Circuit has held that "an administrator does not abuse its discretion when it relies on the medical opinion of a consulting physician whose opinion conflicts with the claimant's treating physician.  This is so even if the consulting physician only reviews medical records and never physically examines the claimant, taxing to credibility though it may be." *Gothard v. Metro. Life Ins. Co.*, 491 F.3d 246, 249 (5th Cir. 2007) (footnotes omitted).  As such, Aetna did not abuse its discretion in relying on Dr. Wallquist's report to deny Shedrick's benefit claim.

---

[135] JE 438.
[136] *See, e.g.*, JE 405.
[137] JE 429.

Finally, contrary to Shedrick's assertions, this case is not analogous to *Bernardo v. Am. Airlines, Inc.*, 297 Fed. App'x 342 (5th Cir. Oct. 22, 2008) ("This [case] is not a situation in which the reviewing physicians reached a different medical conclusion from the medical evidence in a claimant's file or where other evidence of the claimant's condition contradicts the diagnosis of the treating physician."), or *Martin v. SBC Disability Income Plan*, 257 Fed. App'x 751 (5th Cir. Dec. 7, 2007) (same). Rather, the Court finds that the administrative record does contain concrete evidence that Shedrick could perform his own occupation, a light duty job, which supports Aetna's denial of Shedrick's claim. *Lain*, 279 F.3d at 342 (quoting *Vega*, 188 F.3d at 302). The Court underscores that, as the Fourth Circuit has observed, reviewing an administrator's decision for an abuse of discretion means that this Court must "not disturb an administrator's decision if it is reasonable, even if the court would have reached a different decision." *Donovan v. Eaton Corp. Long Term Disability Plan*, 462 F.3d 321, 326 (4th Cir. 2006). Given the facts of the case and the evidence contained in the administrative record, the Court concludes that Aetna's benefits determination was reasonable. Aetna did not abuse its discretion when it made the factual determination that Shedrick was disabled and, consequently, ineligible for disability benefits under the plan.

## CONCLUSION

Accordingly,

**IT IS ORDERED** that Shedrick's motion[138] for summary judgment is **DENIED**.

---

[138] R. Doc. No. 24.

**IT IS FURTHER ORDERED** that defendants' motion[139] for summary judgment is **GRANTED** and that all of Shedrick's claims asserted against defendants are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that Shedrick's request[140] for attorneys' fees and penalties pursuant to La. Rev. Stat. § 22:1973 is **DENIED**.

New Orleans, Louisiana, February 22, 2012.

_____

**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**

---

[139] R. Doc. No. 23.
[140] R. Doc. No. 23, pp. 17-21.